All right, Mr. Rice, you're up. If it pleases the court, my name is Joe Rice and I appreciate the court working with me. I hope my voice holds out and I'm trying to speak as loud as I can, Your Honor. I'm honored to be here today to represent these three individuals that were members of this class without dispute that filed their claim under the settlement agreement that I personally spent over a year negotiating, a settlement agreement that was negotiated word by word that resulted in over an 1,100 page document where the parties discussed every single issue as the documents that are before you established. It was an arm's-length transaction by well-represented parties and there were give and take. An agreement that was reduced to writing for 1,100 pages was submitted to the court, notice was given, and the claims administrators had a limited authority to implement the settlement agreement. That's not what's happened. The question before the court is whether the denial of these appellate's claims under Exhibit 8 of the settlement agreement for their individual economic loss for W-2 wages was permitted under the express terms of the settlement agreement. And quite plainly, the denials were not permitted. The denials the appellates got basically barred their claims without any notice to them whatsoever and without any reliance on the settlement agreement. The settlement program should be ordered to calculate the individual economic loss of these individuals under the express terms of Exhibit 8 and make those payments to the individuals. I have a question. Yes, ma'am. The numbers that your clients say they are entitled to compensation add up to in excess of $700,000 in wages. Add the three together, that's approximately correct. What number was put in the BEL filing as the fixed cost for compensation for these people? The Fleischman and Garcia tax records were part of their filing, and their claim was calculated based on a lost variable profit calculation. And those tax records are not in this record. In the Dixon-Hughes exhibits that were submitted, there's a statement as to their total recovery, which would include their lost variable profit margin for the whole period of time that they chose as their benchmark period. It's not in this record. But the total was about $800,000, their total loss. What I'm getting at, I don't understand the evidence. You say your accountants come up with, and $30,000, they have these various numbers. But let me ask this, if they had put in the total compensation that these people say they were entitled to, let's assume it was $700,000, if they had put that, plugged that number into the BEL claim and said, these are our fixed cost wage costs, how would that have affected the BEL award? The BEL claim would have been, the Dixon-Hughes documents take a hypothetical of that and put it in there, and those documents show that the total claim would have been reduced, I think it's about $80,000. Why is that? I don't understand. Why wouldn't the BEL claim give them the whole amount for their employee costs? Because the way we negotiated the agreement is that a business economic loss claim is based on variable profit margin, and loss of variable profit, which is an entirely different economic concept than loss of W-2 wages. And when we negotiated economic loss claims for the individuals, it was a basic presentation of what I made in the benchmark period, which is the pre-spill period, and I could pick up to 90, I had to have 90 days or more, and then the situation- I'm talking about the BEL claim. Understand, that was a variable profit margin calculation. You don't put in your actual employee costs? You put in the cost under Exhibit D to the Exhibit 4, the agreed-to calculation of variable and fixed costs. A lot of costs can be partially variable and partially fixed. It's a massive amount of- Right. According to BEL documents, it's in the briefs, it says, if you're an officer-owner, your compensation or fixed cost, now, doesn't that mean for the BEL claim, they should have plugged in to their BEL claim their entire- all the money they say they were entitled to as compensation? Benchmark period. Pre-spill. Yes. And what- and you're saying the numbers were way bigger after the benchmark period? The benchmark period numbers, you can- What were the benchmark period numbers? If you look at the accountant's records, they have the- in Record 18-999, you have a series of documents from Mr. Smith. In 18-393, from Mr. Fleischman's. And in 19-975, from Mr. Kelly's. And there, they have a calculation of the total monthly income in the benchmark period, which would have been the reported amount. Okay. How much? Was that anywhere near $709,000? And the- I mean, would it come out to- I mean, I guess my question is, did they ask for- did they put in the BEL calculations the equivalent of $709,000? We do not have in this record the claim of the architectural firm. Why not? Because it's a sealed document, and those claims belong to that entity. And no one's made it part of this record. But your accountants come up with these differentials of $30,000 and some- so they had access. Right. And we put in the record the gross amount. We don't have all of their tax returns. Let me ask a hypothetical question then. Okay. The way the BEL works, if they had used the actual compensation during the benchmark period of what these three men's compensation was, what would that have been? My understanding, if you take the compensation that was treated as a fixed and reverse it and treat it as a variable- No. The documents say treated as fixed. If you treat it as fixed, it would have made an $83,000 difference in their claim. Why is that? Because it calculates variable profit instead of the IELW2 wage line. Let me ask you a question, sir. Suppose they have a draftsman- First of all, how does an architecture firm lose a million dollars from the BP oil disaster? But leave that aside. Would every draftsman at that firm who's getting paid $30,000 a year have the right under the settlement to file an IEL? If they could- they have a right to file it- Yep. Because they're a class member. Yep. And then they would have to follow Exhibit A, and they would have to show by their records that they suffered a loss. If you did not suffer a loss, you would not be entitled to receive anything. Well, if the whole firm lost nearly a million dollars, presumably some people weren't working for a period of time, or maybe that was not a variable cost that was expended. But if you look at the records, the owners put money into the business in 2010 to cover, so I do not believe that- But theoretically- Everybody had a claim because they were paid their full salary. Theoretically, every single employee of every business in it- okay. Just wanted to clarify. I still understand how- I still want you to tell me in the abstract how the BEL is supposed to work. If you're an owner- if you're an owner, officer, and your compensation is a fixed cost, aren't you supposed to put in what your actual compensation for that benchmark period was? It was treated as a fixed cost for expense purposes. But in calculating your BEL- And would you have put in the $700,000 number? Would that have been the way it worked? You would have put in for each year their combined W-2 wages, yes. Okay. So they would have plugged in the $700,000 number. I'm not sure- They should have. They should have. The $700,000 number was for 2010. They would not have used any expense in 2010. They would have gone back to their benchmark period. So the $700,000 number would not- What was the benchmark salary? What was their salary then? If they had used 2007, it was $942,000. If they'd used 2008, it was $1.1 million. I'm rounding. If they'd used 2009, it was $862,000. In 2010, they used $307,000. Because that was their actual expense. And in calculating their claim, they can use three or more months, consecutive months, compared to the same months in the 2010 time period. And those were the calculations that would have been done for the architectural firm's claim. So they put in a low number in the BEL number. They put in the actual number. What did you say? $307,000. Okay. So the point being, though, these class members, there's nothing in the settlement agreement that- Well, just assume we disagree with you on that. I'm just trying to get at if they used apples to apples, would the compensation for the BEL architectural firm have been lower? It would have been lower by about $80,000. According to your accounts, but we don't have the-you don't explain- you can't tell me what they put in. I can point you to the record to- Well, why is it their compensation was so much lower in those years and now they're claiming $709,000? Because you're calculating two entirely different economic losses. You're calculating wage loss. All right. Why is their wage loss- Why is it that-why wasn't that the fixed compensation cost for the BEL? I don't understand why they're different. Because in the IEL framework, they were told to take 90 days or more of their past- in this case, they took nine months- and compare it to what they made in the year of the spill, and the difference was their loss, and they got a .25 RTP on top of that. That was the methodology that was agreed to for an individual. It was calculating their specific economic wage loss. But when they filed their BEL claim, you're telling me they used different numbers. In the BEL claim, it's a variable profit margin calculation. What did they use for the wage fixed cost? Is it a different number from what they're claiming for the IEL or not? Yes, they used what they spent, which is what their actual fixed expense was. Okay, and it's a lot less. $307,000. $307,000. $307,000 is- That's 2010. Right, which is the period that she's asking me about. No, she's talking about the benchmark, I thought. Yeah, I'm talking about the benchmark. I don't know the benchmark period that they used because I don't have that file, but I know- If you said that you used $709,000 for the benchmark period, they would have gotten a lower BEL, right? They would have gotten a lower BEL, yes. Okay, that's my question. Thank you. But it would not have been to the extent of the IEL value of these individuals' claims, which is shown by doing the calculation in 2010, which is in the record, and shows that it's only about an $80,000 benefit to the architectural firm. I still don't understand how you calculate that unless we know what number they used in the benchmark period. I know that the expenses for these three individuals, as their compensation as owners and officers in 2010 was $307,000. That's in the record. And I know that when you calculate their combined W-2 wage loss, it's in excess of $750,000. That's in the record. But you can't tell me what the benchmark wage was. I can tell you that I have the data for the actual time, but I don't have anything in this record that gives me the Fleischman Garcia architectural firm's claim because it's a protected document under their claim. And we don't have it, and nor did the court have it, nor did the claims administrator have it, that it could use. But what they did is they just created a process that said owners and officers, we're not going to treat you as individual economic losses, but there's nothing in the document to support that. Well, let me ask you a question, though. Obviously, a previous panel of this court thought that this was a very significant issue. How many people are there in this position who could allegedly claim for a professional corporation and as individual economic loss? I only have anecdotal information on that because I don't have access to all the claims. I'm aware of about 50 or 75 that either I represent or people have contacted me about filing a MECA or asking my advice on things. I'm sure there are more than that, but I would not have any way to know the actual number. So what was it, the 50 or 75, and the size of the multibillions that we're talking about? It's not a lot. So why are you so upset about all this? Well, for two reasons. I mean, I know you're representing your client, but Mr. Rice doesn't come to the Fifth Circuit for nothing. Well, thank you. I've been here several times, Your Honor. I learned a lot in the Amchem cases. I was class counsel in Amchem. I was class counsel in Ortiz as well. And I understood the deal about not creating an interclass conflict. And what the claims administrator has done here and what the court has supported is directly creating an interclass conflict that we painstakingly avoided in this negotiation because this policy and this approach pits the business against the owners and officers, both of which are class members, both of which were told by the court in the final document that nothing that one class member receives will interfere with what any other class member receives. Yet that's exactly what's happened here. Well, now, wait. I mean, is it a conflict or is it a set of alternatives? It's, I believe, a conflict, Your Honor, because there is no offset provisions provided. And what we try to do in front of the panel and in front of the district court is to show that you were creating this conflict because you were pitting recovery. And what makes it worse is if you apply the 363, and it has been applied this way, it's first come, first serve, so that if the employees get there first, they get paid. And then if the business comes later, it gets paid with an offset. But if the business comes first, it gets paid, and when the employees come, they get barred. Well, how many employ... I mean, it seemed to me that this situation was uniquely susceptible for LLCs. Here you have three architects, the co-owners of the business, so you could have dentists, you could have doctors, you could have electricians. It's mostly all C-Corps and sub-SBOs. Exactly, exactly. Where the employees and officers file a joint tax return because they're all the owners. During the negotiations, we had a map that gave us the ability to circle an area and determine the businesses that were in that area. There's a tremendous number of sub-S's and a corps in the Gulf Coast area, particularly in the lower coastal area. I'm sure. There are. There's a number of them. All businesses, absolutely. Now, let me ask you one other question, since your time is technically out, but this is... They make the argument that you waived this broader issue about double compensation because all you asked for in the lower regions or whatever the other process, you know, the preceding process, was for an offset. That's incorrect. If you look at the documents, our appeal briefs, we talk about this being an impermissible interpretation, and the presumption was it created a double recovery, and we pointed out that the double recovery was not even factually supported. But fine, but you're talking about the appeal brief to Judge Barbier. No, the appeal brief at the first level of the appeal panels. In those briefs, I believe it's like page 11, and those briefs are here. In . . . But you're saying from the claims administrator to the appeals panel, you, quote, preserved the issue. Yes, ma'am. Okay, that's all I wanted to know. 1911 of the record is the example. Okay. Thank you. I just want to make sure I understand the process. It's a hypothetical matter. Let's assume that, and I'm not suggesting at all this is what your clients did, but let's assume you have owner-operators, and the benchmark period, they put in a low-ball number for compensation for themselves, and that results in a higher profit under the BEL. Is that not right? If the company had an actual lower cost for owners and officers' compensation, and you treat it as fixed, it would change the number and would give them a higher BEL recovery, but not to the extent of the IL recovery. But the point I think you're getting to needs to be premised by, we're using tax records to do this that were created before this settlement came about. No, I'm just saying. Yeah. I'm just saying, hypothetically. Yes, and that was absolutely known by everybody at the time we did the brief. Then you could say, well, I should have been compensated twice then. It's not compensated twice because you're calculating variable profit in one situation and W-2 losses, but sophisticated business with tons of experts at the table in an 1,100-page document that does everything in the world you can imagine to try to explain itself. Nothing, not one word, is mentioned about owners and officers being treated differently in the IL concept, and the tax records that are being used were contemporaneously retained, maintained records from a period of time where they had no idea what the settlement was going to be if there was going to be a settlement. So there's no idea of... I support your point on this point. You've preserved your time for the vote. Mr. Clark's argument will beget other features of this, so when you come back up on rebuttal, if there are other questions, we'll go down that road. Well, let's hear from Mr. Clark on his... May it please the Court. I'm Jeff Clark from Kirkland & Ellis here on behalf of BP. Let me start with Judge Owen's series of questions about the numbers, because I think I can help there in terms of why Mr. Rice's approach is really an apples-and-oranges approach that departs from the settlement agreement, which explains why a kind of search to make the numbers line up won't work. And so let me start with this. I was not as closely involved in the negotiation process as Mr. Rice, but I did work closely with the economists, and I understand the way in which the BEL program was set up. So it's a variable profit analysis that it looks at a change from the benchmark period to the period after the spill to look for what impacts the spill might have. So variable profits are revenues minus variable expenses. So fixed expenses, if something is classified as a fixed expense, it's not going to be subtracted. So if you wind up in a period where, you know, you in the post-spill period voluntarily reduced executive compensation because you had less... you had a harder economic situation to deal with, you're benefited by the fact that Exhibit 4D specifically provides that fixed expense, that all owner-officer compensation is going to be treated as a fixed expense. Because even if you reduced it, even if it really were a variable expense, it's not going to be treated that way. That's favorable for you. So what Mr. Rice offered to do, it's kind of clever, but the district court very easily rejected it. He said, well, we're going to have our accountants assume that the owner-officer compensation were actually treated as a variable expense. And then if it is treated like that in that hypothetical world, we're going to run some numbers and we're going to see how much that actually benefited us. And then we're going to offer to give that back. If you look at 18406 of the Record on Appeal, you'll see where the appeal panel spotted that that's what Mr. Rice was offering to do, to give back that what sometimes I call a BEL sweetener. And the problem with that is that that's just entirely foreign to the way the settlement agreement works in Exhibits 4A through D. And the district court said that in its opinion very clearly. Furthermore, the court does not read the settlement as permitting claimants to choose to have owner-officer compensation reclassified as a variable cost under the BEL framework or to have their IEL claims set off by the amount of compensation the firm received from having owner-officer compensation calculated as a fixed cost as claimants propose. So this is really a kind of giant non sequitur, this whole notion of let's, you know, look at an offset. It's entirely contradicted by the text of the settlement agreement and the way that it works. It's just a hypothetical way that Mr. Rice formulated with some accountants to try to, you know, create a fact issue and some sort of doubt about whether they were being made whole or not under the settlement agreement. So at that point, let me talk about Mr. Rice's make-whole argument. So his argument about what makes claimants whole is circular because it assumes exactly what he's trying to prove. He's trying to prove that he should get really three things, the base BEL compensation, all of the IEL compensation on top of that, and the BEL sweetener from this special fixed cost, one-size-fits-all treatment that exhibit 4D supplies. The reality is that if you were in a situation where, say, someone were injured by this bill to a tune of $100,000, and under the arguments we were making, you know, the owner-officers, even if you netted together the BEL award, they were only getting $90,000, right? Then you could make an argument of BP's interpretation is leaving people in a position where they're not being made whole. But that's not the situation we're dealing with here. It's very important to understand that once you get a BEL award, once you get to the notion of how much variable profit was lost from the benchmark period to the period after this bill, you don't just stop there. You apply other variables, like a growth factor. And most critically, you apply what the agreement refers to in Exhibit 15 as an RTP, a risk-transfer premium. So what that does is it takes the award that makes you whole, makes the business whole, and it adds additional compensation on top of that. So here, the RTP for a Zone C business in Tampa is 0.25. That doesn't mean you get 25% of the compensation that would make you whole. It's an additive multiplier. So it means you get 125% of what would have made you whole. So the whole notion, this whole kind of concept of, you know, these folks are not being made whole is also a chimera because they're getting 125% of this, plus they're also getting this favorable treatment in Exhibit 4D that provides that fixed costs... I'm sorry, that owner-officer compensation, regardless of a matter... as a matter of fact, of whether it would be variable or not, because a business might rationally reduce its executive compensation in response to this bill. It's going to be treated in all instances in a completely favorable way across the board for every BEL applicant. How many of these disputes have reached the Fifth Circuit? I mean, these ones that had to have oral argument. Because we're getting individual claims, but... Yes. I would estimate, Your Honor, about... Because this is the first one I've been on. About 14, and that counts maybe three that Special Master Free is involved in, as opposed to BP, where he is, you know, either defending or potentially taking appeals against what happened in the court-supervised settlement program as reviewed by Judge Barbier. And then the other... That's responsive to Judge Jones, meaning disputes in this narrow, narrow, narrow contract or disputes with respect to construing the settlement agreement and different kinds of claimants. Which are your answers? Disputes about this particular economic loss settlement agreement. And there was one appeal I should also point out where the issues involved both the medical settlement... That's the only appeal I know of, so there's just one medical appeal settlement. But it actually was kind of a combined economic loss and medical settlement appeal. Okay, well, I just want to understand the answer, because this is about my fourth at least. I mean, I saw you last month, and that was, you know, another appeal concerning the settlement agreement and the layers below decisions of whether people were in or out. And then in another one, whether or not, you know, the transition of the business from one forum to another, you know, so anyway. So I was just wondering whether your answer was specific as to this kind of deal, you know, in this corporate firm versus appeals we're getting where it's a dispute under the settlement agreement, not about the original, you know, who got harmed, but appeals where we're being called upon to construe the settlement agreement. Was something in it or out? Just like here, you know, there's an argument. Okay, there's nothing in the settlement agreement that prohibits it, that bars it. So that seems to be kind of a problem. But I guess you're talking about in this narrower and narrower... Right, and so, Chief Judge Seward, I would say, I understood Chief Judge Jones' question. I'm sorry, Judge Jones' question to be about how many have been argued, and my estimate for that's 14. There are a number of them that you've resolved without oral argument, often in unpublished plaintiffs. That's a larger, larger problem. So that's my sort of attempt to answer Judge Owen's question about the calculation. I'm not sure I do understand. Did we know what numbers... Did they use their benchmark year compensation? Was it comparable to what they're claiming now? I'm not sure I understand that question. I think that there's no dispute, I don't think, that their BEL award was properly calculated. But you don't know what their officer compensation was? In that calculation. It wouldn't have been in the calculation, Your Honor. That's what I was trying to explain, because it would have been treated as a fixed cost, right? So the only reason why there's a calculation about their owner-officer compensation is because they created one hypothetically and then said, if you ran our hypothetical approach, which doesn't comport... All right, I'm trying to conceptualize what was calculated in BEL. You said they didn't look at fixed costs at all. Yes, because if you're doing a variable profit analysis, you're just subtracting the variable expenses, not the fixed ones. So, you know, as an example, in terms of the way I learned this in economics class, right, if you had a building, right, that you had sort of purchased and owned, you know, you don't... If you're sort of figuring out whether your business  you don't really look at, you know, what the costs are related to that building if they're not variable costs. If they're fixed costs, they're sort of... They're already sunk, if that makes sense. So that's what the economists focus on, variable profit here and not on... But you just looked at their profits. I still don't understand how you can calculate profit without looking at fixed costs. Because you're not calculating sort of profit the way maybe an ordinary person might think about it, right? You take your sort of total revenues minus your total expenses. You're looking at this... What you call operating profit, right? Right. You're looking at this economic concept of variable profit. And that's what the parties agreed would be the baseline for doing the analysis. Okay. The other reason why the numbers don't line up is because... And I think Mr. Rice said this in his answer to you. The two programs have entirely different set of variables, right? So you're doing one entirely different set of variables, like, you know, maybe four or five variables on BEL and another set for IEL with different multipliers. It's apples and oranges. It might be apples and oranges, but I think the question is, are they duplicative or are they alternative means of calculating owner-operator compensation? So I think if you take a step back to the stage where we're negotiating, I would say that there were alternatives, right? We could have decided to just say, look, as most economists would say, executive compensation, because it can change as a result of some event, is a variable expense and not a fixed one. We decided across the board to give this fixed expense treatment as a favorable, you know, way to increase BEL compensation. Having done that, then that's why there can't be IEL compensation, because that's what the double recovery is. But they could have requested either one. If they had decided, essentially, to forego BEL compensation and come in and say, we only want IEL compensation, they could have done that. I don't think any rational economic set of actors, especially in a kind of small firm like that, would have done that, because the number you'd get from the BEL is going to be inherently bigger than the number you're going to get from IEL. What part of the agreement itself... I understand your argument, what you just said, but what part of the document do you rely upon to say that, as we've done through a whole bunch of these other ones, you know, looking at, almost like saying, look first to the text of the statute. So I hear you as far as the argument you make in terms of the economics, but stripped to the essential... Stripped to the extent, you know, pure lawyer point, Chief Judge Stewart, is look at the special note that was very carefully negotiated in Exhibit 4D, which has a special provision in it about... And it is the most specific provision. I think it triggers the canon of the specific controls of the general about owner-officer compensation, and it provides that it will always be treated as fixed costs. Then why wasn't there a corresponding special note in IEL saying this does not apply to owner-operators? So, Judge Owen, Judge Costa had asked the same question, in the first oral argument. And, you know, the answer I can give you is, you know, Mr. Rice has a whole section in his brief where he talks about there was a special working group created, there was extensive negotiation about Exhibit 4D, and this is what resulted. Would it have perhaps been better if Exhibit 8A had a cross-reference back to Exhibit 4D's special note? I can't fight that, but what I would argue to you is the extensive process resulted in the note in Exhibit 4D. But that doesn't say that owner-officers are ineligible for IEL, and this is the only compensation they'll get. That just doesn't say that. So the argument, Judge Owen, is that there's no rational reason why BP would have agreed to, you know, classify all owner-officer compensation as a fixed expense, which inherently makes BEL awards pop up and get bigger if it wasn't intended to exclude IEL. And Judge Barbier... And Judge Barbier... That's how Judge Barbier read the agreement. In the prior appeal, you know, the remand occurred because the court wanted Judge Barbier's views being the most familiar with the agreement on this issue. And, you know, I frankly submit to you that he didn't think that the question was very hard. So, you know, could there have been, you know, another reference in Exhibit 8A to eliminate any ambiguity? You know, perhaps, but I think... Has anybody argued ambiguity? So on ambiguity, yeah, I think we are. That's what we're arguing in terms of the double recovery point, right? If the agreement... If you look at the agreement as being ambiguous, then you should construe it, as this court did in the Walker Fishing Fleet case. Have you argued it's ambiguous? I think we've argued it in the alternative, Your Honor. You know, that... We've argued the double recovery point, right? And I think the double recovery point, it's not, you know, freestanding, right? Would it be conceivable if there are two programs and they clearly said you get a double recovery? You know, you wouldn't be able to say, okay, we'll ignore the text of the agreement. Well, let me give you an example. You have special compensation programs for shrimpers and doctors, evidently. How many special compensation programs do you have? There are about 10. Does each one of those say you cannot get IEL compensation if you're in this program? No, Your Honor. QED. But to the point, though, you know... Because the opposite of that is that every person in every one of those programs who also files a sub-S or something could seek either an IEL or both an IEL and their special recovery under Mr. Rice's argument, right? Right. So I think what you're going to hear from Mr. Rice on rebuttal is that IEL and BEL were separately negotiated, and then, you know, he uses this point of kind of W-2 wages to almost, you know, confer, like, these are sort of little folks. You know, look, if you had a business... Let's take, like, let's say McDonald's filed a claim, right? Like, a coastal McDonald's filed a claim, and that, you know, they had maybe a coastal corporate subsidiary, right? So they filed a BEL claim, and then the people who work at McDonald's filed IEL claims. There's no dispute from BP that that's entirely possible, right? There could be lost business profits by McDonald's, and also the people who work at McDonald's could file IEL claims. The only dispute is what happens when you're talking about this special problem, which is exactly what Exhibit 4D is designed to solve. Yeah, but I get that, but, you know, I guess I may have heard too many of these cases. I get it, and I understand it. I follow the argument you've made, you know, about the economics, et cetera, et cetera, but, you know, this isn't just a run-of-the-mill contract where we're construing it against a drafter. I mean, it's not. This is a very sophisticated agreement, 1,100 pages, negotiated by both sides, so there's no construing against a drafter, but I've been on some of these, in a way or otherwise, where BP has stringently argued, forcefully and persuasively, language in the document which specifically precludes or makes the point BP seeks to argue, which is to say BP knew how, in the negotiation, to nail it down, put a rivet in it, put concrete in it, put everything in it, but on the other hand, in the specifics where at least it's arguable, you know, one way or another, it's to say BP would never have agreed to X if it were meant to be Y, so to speak, so not argue specific language in there, but argue, step back, understand the analysis, and go that way. You see where I'm going? I see where you're going, Chief Judge Stewart. I think what I would refer you to there is the matching decision, which we also often call the Deepwater Horizon I case from October of 2013. There's no specific provision that says, you know, you have to do matching. It was deduced from the logic of the fact that in Exhibit 4C, you have this variable profit test, which, you know, takes revenues and then subtracts the corresponding, you know, variable expenses from it, and so if you're going to do that, it doesn't work economically if you could do what was happening before that decision disciplined it and said that was incorrect under the settlement agreement. You would just get, you know, an economic mishmash. You would get something that doesn't make any sense. The whole point of these Exhibit Series 4A through 4D is to produce this economically rational result, and what's happening here with the special problem of owner-officer compensation, which is a very special issue because insiders can control whether earnings are retained or whether they get paid out, that's why we settled after extensive negotiations on this special note in Exhibit 4D, and that's what we're trying to enforce as a textual matter. But I think it's enough as a textual matter, but even if you were to view it, as you might be suggesting, Chief Judge Stewart, as being potentially ambiguous, you know, I think that that's where the anti-double-recovery notion comes in, which the Court did adopt in the Walker Fishing Fleet case, a prior CSSP appeal. And so both on the text, the economic logic, and the notion of it being ambiguous as tied to no double recoveries, all of those things, we think, they all harmoniously line up to say that you can't pay the IEL claims on top of EEL claims here. And that that's exactly why Mr. Rice designed his new argument with the offset that doesn't comport with the settlement agreement, because he made a strategic choice of, Judge Barbier knows this agreement, I'll take a shot at seeing if I can get this offset concept, you know, him to adopt that. And he flatly rejected that argument as well. So you're backing off the waiver argument? No, Your Honor, I think that's part of the strategic choice. I think Mr. Rice is correct. He made this argument at the CSSP, his full-blown argument, and his argument of, if you do my math, my hypothetical math that doesn't comport with the settlement agreement, that, you know, as an alternative, I also went under that ground. But when he got to Judge Barbier, he really put his eggs in the basket of, give me the offset. As a matter of fact, there's no double recovery here, because I'll pay back the BEL sweetener that comes in with the Exhibit 4D treatment. And there's no option to give it back. Ergo, the whole argument is all wet. All right. All wet, huh, Mr. Clark? Okay. Thank you, Chief Judge Stewart, and the Court. Thank you, Mr. Clark. I'll probably see you, I guess, next month. All right. Back to you, Mr. Rice. Thank you, Your Honor. Judge Jones, I'm going to go back to your question you had on me. Why am I here? When you spend as much time that the parties in litigation spend in negotiating agreements, you expect those agreements to be followed. They're contracts that if the Court approves them, they're binding. And there's nothing in this contract that BP can rely upon that excludes an owner and officer's claim. In fact, if you go specifically to the terms of the settlement agreement itself, Exhibit A, by definition, the individual economic loss claimant has to file an ILO claim, IEL claim, if he's a W-2 wage firm. He shall apply to the claims. Every employee at McDonald's across the Gulf Coast had to file IEL claims. They could have been class members if they had a loss. What I don't understand is these people got $825,000 already, right? Well, actually, the number is 606. Their actual recovery number was 626. But they have gotten none of it. That's still $209,000 per guy, right? But if you look at their historical wages, they were making $200,000 and $300,000 and $400,000 a year in W-2 wages. I understand that. Until 2010. And they were paid, and their BEL claim is 626, according to you. That was their ILO losses, was 626. I was talking BEL. They got $825,000 BEL, did they not? The company did get that, yes. Correct. So that they divided up three ways, I'll bet you, and that buys a nice new boat for each one of them. Well, number one, the Fleischer-Garcia records are in the record. They're voluminous. They can be found starting at 17769, and they go on for several hundred pages. Their benchmark period was May to November 2010. Excuse me, their claimant period was May to November 2010, and their benchmark was 2007-08-09. So they used the broadest period that was available to them. The settlement agreement does not give an individual taxpayer an option. They have to file under the IEL plan. Why did they file a BEL? Because it also requires the business to file under BEL. There is no option. There is an option. They didn't have to seek double recovery. They did not have to seek double recovery, nor did they seek double recovery. They sought to recover their lost profits in the business and then their lost economic losses. But if you're a subchapter S, your lost profit is what you make. And what you lost if you carry forward, which they ended up putting $200,000 into business in 2010. There has never been an argument made by BP in any of the voluminous briefing here in any of the appeal panels of Judge Barbier that presented anything as being ambiguous. No one has argued there's anything about this that's ambiguous. The issue on matching in the previous appeal was because accrual accounting did matching and cash accounting was being interpreted to be cash on cash. There was an internal inconsistency. That's what made that ambiguous. There's no internal inconsistency here whatsoever. Well, the variable BEL assumes that they paid their people their compensation for the years. BEL says you take your revenue and you take your variable expenses. It doesn't include any factor for fixed expenses. But it assumes you paid your fixed expenses. Well, you could have paid zero, which, I mean, it's just not a factor. That's right. So you take your gross revenues as if there was nothing except paying the electrical bill and a few draftsmen every month. And, therefore, the revenue, the operating profit, is much higher than it would have been if you factored in the payment to each of the owners. That's what the contract says. And that's what the parties agreed to for BEL claims. And nowhere did anything in the notice, in the court rulings, or anywhere else provide owners and officers any information that they were going to be treated differently. And on the question— How come did Barbier be so wrong? He misinterpreted the contract. And he went beyond the power of the court to rewrite a contract that's been through final approval. This was not during the certification process or during consideration. It's now, after it's complete, it's a binding contract. And Judge Barbier wasn't wrong when he said the claims framework functioned so as to ensure that a benefit paid to one member of the class will in no way reduce or interfere with a benefit obtained by another. And that's at the final approval order 7778. These parties, these men, sophisticated. There was nothing when they read this notice that gave them any information that they were going to be excluded from a class that they were expressly defined into. To do that now, after finality, is a violation of their due process. Well, am I wrong to say that you've got the Shrimpers organized as an LLC, and you have two or three fellows who own a couple of shrimp boats, so they make a claim under the Shrimper policy and then they make a claim under the IEL policy also? No, I think you addressed that in Walker. The seafood claimants were defined and placed into the specific seafood fund. They would not have had an alternative. They had to go to the seafood fund. Where does it say that? In the seafood fund documents themselves. It defines the persons, the class members that have to come under there. And they can't come back into the BEL claim. Then who is in an IEL who is IEL covers all wage earners? It covers individuals that report their income on 1040, not C, E, and F. Well, I don't know. I don't remember what C, E, and F are. I know what 1040 is. Okay. It's considered wage earners. It does not include sole proprietors. We went painstakingly through and excluded those that would be excluded. We excluded sole proprietors. We excluded self-employed. If they had wanted to include owners and officers, they could have put it in the same paragraph. Never raised it. They never addressed it. And it's not in the document. And I submit that the law was perfectly clear that once the document is found, it's a contract to be enforced and not rewritten. And that's what's happened here is they've attempted to rewrite the contract after it was in place. Of course, we're getting that same argument on every one of the unpublished opinions that are claims appeals also. I don't have access to the unpublished opinions. I think we got you. Thank you. We have your argument. Thank you, Mr. Clark, for your briefing and oral argument. We'll take it under submission and we'll decide it. This concludes the cases to be argued today. The panel stands in recess until 9 a.m. tomorrow.